**STATE of Missouri, Respondent,**

v.

**Jerry Wayne McDARIS, Appellant.**

**No. 55346.**

Supreme Court of Missouri,
Division No. 2.

Jan. 11, 1971.

Motion for Rehearing or to Transfer to Court En Banc Denied March 8, 1971.

John C. Danforth, Atty. Gen., Frank P. Cihlar, Asst. Atty. Gen., Jefferson City, for respondent.

Neale, Newman, Bradshaw & Freeman, Paul L. Bradshaw, Jerry L. Redfern, Springfield, for appellant.

RICHARD P. SPRINKLE, Special Judge.

On November 4, 1969, a jury in Greene County convicted the defendant of possession and control of a bomb. Defendant was tried as an offender under the habitual criminal act and sentenced by the court to a ten-year term in the Missouri Department of Corrections. Defendant appeals from this conviction and sentence.

The testimony reveals that on August 25, 1969, one Joan Hester was transported to Mount Vernon, Lawrence County, Missouri, by sheriff's deputies from Springfield, Greene County, Missouri. She was taken there to testify in a preliminary hearing against the defendant, Jerry McDaris, who was charged as an aider and abettor in stealing sixty-three dollars ($63.-00) (a crime independent of the matter under consideration here).

On the way to the hearing, Joan Hester and the deputies discussed threats that had been made by the defendant and his brother against Joan Hester.

At the preliminary hearing, Joan Hester was the only woman to give evidence against the defendant. A Clarence Gwinn also testified against the defendant. After the hearing, but while still in the courthouse, Gwinn overheard the defendant state to his brother, "Let's get that goddamned bitch." Gwinn reported this statement to both the judge and the Lawrence County Sheriff.

Thereafter, while Joan Hester was being returned to Greene County by a Lawrence County deputy, a radio dispatch (on a frequency used by the sheriffs of both counties) was received by the transporting officer. The information received was that

the McDaris brothers were going to make an attempt on the witness Hester.

Immediately thereafter, a white 1960 Chevrolet was seen behind the deputy's car. The deputy advised Joan Hester to lie down in the rear seat of the car and began to accelerate his automobile, reaching speeds of 95 to 100 miles an hour, with the white Chevrolet following.

The two cars traveled at these high speeds for about twenty minutes until Greene County was reached and the following vehicle was stopped. The two McDaris brothers were in the car. However, no arrests were made.

After being returned home, Joan Hester was advised to call the Greene County Sheriff's department if any of the Mc-Darises came to her house. About 5:00 p. m., the McDaris brothers, in the company of Karen Bacon, drove up in front of the Hester house. Karen Bacon came to the door, and was answered by Joan Hester's sister. Threats were made against the person of Joan Hester. In response to earlier directions, Joan Hester called the sheriff's office, telling them of the visit and the threats.

During the course of this same day, the radio dispatcher in the sheriff's office received four other calls all from unidentified persons reporting that the defendant had been seen in a white Chevrolet and that he was armed and drunk. These calls were received at various times during the evening. Operating under what is called a "good check", meaning to stop and frisk a suspect, the dispatcher sent out such a call to enforcement authorities in the area. The "good check" order went out following the call from Joan Hester and the first phone warning. However, the subsequent arrest of the defendant was later that evening after all the calls had been received.

The defendant was known to the police and prior "good check" orders had been issued with respect to him.

Several of the calls reporting the defendant at a service station in the white Chevrolet proved to be accurate. Two deputies in an unmarked car followed the defendant from the station. While they were following, city policemen stopped the defendant, searched him, his brother, the car and the other passenger, Karen Bacon. Being suspicious of Karen Bacon's actions, a city patrolman found a stick of dynamite, fused and with detonator in place, concealed in the waistband of her slacks.

Karen Bacon did not testify at the hearing on the motion to suppress evidence of the dynamite. However, her testimony at trial reveals that while her car was being stopped by the police, the defendant produced the dynamite wrapped in a sock and told her to hide it in her clothes.

Defendant's first assignment of error deals with the trial court's overruling his motion to suppress evidence of the dynamite. The thrust of this assertion is that the arrest was without warrant, without probable cause and no crime had been committed in the presence of the arresting officer, thus the fruits of the subsequent search were unlawfully obtained. Defendant devotes much of his brief to this issue, and seems taken with the thought that his arrest and the search disclosing the dynamite all stemmed from one unidentified phone call.

For two reasons, the court sees no merit to this contention. First, the receipt of numerous facts and the happening of several events led to the arrest, not just an isolated call. Second, the defendant has no standing to complain about the search. The search was of a car not owned or driven by the defendant, and the dynamite was not found on the defendant but was found on the person of Karen Bacon.

The defendant, in his brief, cites numerous federal cases dealing with arrest, search and seizure. The defendant also discusses the question as to whether there was probable cause for the officers to arrest the defendant.

The cases relied on by the defendant are United States v. Mitchell, W.D.Mo. (1969), 299 F.Supp. 1395, 1402(10, 11); Spinelli v. United States, 393 U.S. 410, 427, 89 S. Ct. 584, 21 L.Ed.2d 637; Wrightson v. United States, 95 U.S.App.D.C. 390, 392, 222 F.2d 556, 558[2] and White v. Swenson, W.D.Mo., 301 F.Supp. 447, 463–464[7].

The defendant also cites the recent Missouri case of State v. Goodman, 449 S.W. 2d 656, which relies on the case of Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142. All of these cases deal with, inter alia, the question of probable cause to make a warrantless arrest. This court does not take issue with those findings based on the facts in each case, but they are each patently distinguishable from the case at bar.

The court deliberately extracted from the testimony of the witnesses who testified at the motion to suppress those facts which clearly show numerous grounds of probable cause for the defendant's arrest and the search which followed.

The dispatcher in the sheriff's office issued the "good check" order only after the following events took place.

Joan Hester discussed with the sheriff's deputies threats that had been made against her by the defendant and his brother.

Following her testimony at the preliminary hearing, Clarence Gwinn overheard the threat made by defendant against Joan Hester. This informant was known to the sheriff's office and it was known he was physically in a position to overhear such a threat. He related this information to both the sheriff and the judge.

On the way back to Springfield, the defendant and his brother followed or chased the sheriff's car containing Joan Hester. This was a high speed chase and the defendant's presence in the chasing automobile was know to the sheriff's deputy and to Joan Hester.

After her return home, Joan Hester saw the defendant drive up in front of her house and one of the defendant's companions came to the door and delivered a threat. The sheriff's office was notified of these events.

Early in the evening of defendant's arrest, the dispatcher received a call from an unknown person advising that the defendant was carrying a weapon.

The defendant was previously known to the sheriff's office and "good check" orders had been issued on him before.

■ A basic premise of defendant's argument is that since the order to stop and frisk went out following the first anonymous call, then in considering probable cause for the subsequent arrest the court should not consider the other three calls warning that the defendant was armed.

To affirm this position would be to declare invalid all other proper sources of information unless the "good check" order was issued after each bit of information was received. Otherwise a reviewing court could only consider limited information, even though the defendant was not subjected to any arrest or search until a number of events confirming the right to arrest had taken place. In this case, the sheriff's office received several calls after the "good check" order was sent out. The statistics received from these callers proved to be accurate, because the defendant was located where the caller said he was and the description of the vehicle he was riding in was correct.

These calls can all be considered as additional grounds for probable cause in the defendant's arrest, and the search that followed. It is not necessary that a "good check" be issued after each call in order to make valid the warrantless arrest and search.

To accept the premise of defendant's argument, that is, that there was such a paucity of justifiable cause for the actions

of the enforcing authorities would be tantamount to subjecting the general public to systematic annihilation. In our overzealous desire to protect the rights of all persons, who are suspect, from the capricious whims of the police authorities, too often the equally or perhaps greater duty to protect the victim is forgotten. Possibly there exists an unspoken or unacknowledged distinction between the right to arrest and search a suspect after the commission of a crime as opposed to the exercise of that same right in order to prevent serious injury to the known innocent victim. Such authority can be exercised without either giving rise to the fear of creating a police state or violating the constitutionally protected rights of any citizen.

It has been stated that "laws are not made for the innocent." It is suggested with equal emphasis that "preservation of the law requires protection of the innocent."

As indicated by the defendant in Beck v. Ohio, supra, it was stated:

"The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating * * * often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

It is suggested that another "compromise" is manifest; that which exists between preserving the sometimes expansively construed constitutional rights of a known criminal and that of protecting an innocent victim from even a veiled suggestion of harm—and all too often the victim is the general public.

In the case presented here, the quality of good police work, the proper handling of reliable information, and the skillful protection of a citizen should not be adulterated by judicial hindsight.

■ The matter of the defendant's standing to object to the search of the automobile and the person of Karen Bacon is significant. It is disclosed in the record that the automobile in which defendant was riding was not owned by him, was not driven by him nor does he claim any possessory right in said automobile. The dynamite with which defendant was charged as having possession and control was not found on defendant during the search but on the person of Karen Bacon.

The defendant and his brother did not testify at the defendant's trial. The defendant presented testimony from five witnesses. The testimony was all directed at attacking the character of Karen Bacon, who gave evidence for the State, and in trying to show that the dynamite found on Karen Bacon belonged to her and its existence was unknown to the defendant.

In dealing with the question of "standing," the defendant cites as authority for his position the case of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed. 2d 697. A proper consideration of this point requires remembering that the defendant was charged with possession and control of a bomb.

The Jones case deals with the standing of defendant to assert a motion to suppress evidence of narcotics found in an alleged illegal search. The narcotics were found in an apartment not owned by the defendant, nor in which he claimed any possessory interest. He kept some of his clothes in the apartment and he used the apartment with permission of the owner. The defendant was charged with having: (1) "Purchased, sold, dispensed and distributed narcotics"; and (2) "Facilitated the concealment and sale of narcotics."

The opinion stated that essentially the defendant was charged with "possession of narcotics."

Without getting into the technical ramifications of the Jones case, the essence of the opinion, as it pertains here, is succinctly stated in Simmons v. United States, 390

U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

"[W]e have * * * held that rights assured by the Fourth Amendment are personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure. See, e. g., Jones v. United States. * * * At one time a defendant who wished to assert a Fourth Amendment objection was required to show that he was the owner or possessor of the seized property or that he had a possessory interest in the searched premises. In part to avoid having to resolve the issue presented by this case, we relaxed those standing requirements in two alternative ways in Jones v. United States, supra. First, we held that when, as in Jones, possession of the seized evidence is itself an essential element of the offense with which the defendant is charged, the Government is precluded from denying that the defendant has the requisite possessory interest to challenge the admission of the evidence. Second, we held alternatively that the defendant need have no possessory interest in the searched premises in order to have standing; it is sufficient that he be legitimately on those premises when the search occurs."

If these two rules are accepted at face value and no exceptions are to be considered, then the defendant would have "standing" to object to the search of Karen Bacon. However, in the evermore complicated game of legal "hide and seek", it seems incongruous that the Jones opinion and those subsequent cases relying on that decision were intended to mean that a defendant had legal standing to object to the search of another person. Even though the defendant here may be prejudiced by the result of the search of Karen Bacon he was not under Federal Rule 41(e), "a person aggrieved * * *" by the search. Presumably, he had standing to invite scrutiny of the search of the automobile and himself if evidence from such a search was offered against him.

However, as stated in the Jones case:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search and seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search and seizure directed at someone else."

In the case presented here, the defendant has placed himself outside the Federal Rule 41(e). He contends that the dynamite found on Karen Bacon belonged to her and that he knew nothing about it. The defendant has set his own trap and he has not been placed in the untenable position of having to admit possession of the dynamite by asserting his "standing" to attack the search and seizure as suggested in the Jones case.

The only course left open to the defendant is an impractical and absurd one, that is, to dispute the search of the person of Karen Bacon and the seizure of the dynamite from her on the grounds that she was his agent and as such, the search of her person constituted a search of him. To resort to this extreme would compound the already expansive and verbose interpretations of a once simple Rule.

Therefore, no error is found in the action of the trial court in overruling defendant's motion to suppress.

■ Defendant's second point on appeal deals with the trial court's failure to sustain the defendant's affidavit for disqualification of the judge which was filed four days before the trial.

A proper consideration of this point requires an appraisal of Supreme Court Rule 30.12, V.A.M.R. This rule requires that such affidavit be filed five days before the day the case is set for trial.

In order to avoid the time limitations of the rule, defendant asserts that his request for disqualification was filed at his first knowledge of his ability to take such action and was filed in good faith and not for the purpose of delaying the trial.

Little credibility can be attached to this statement, when the true reasons for defendant's request were revealed at a hearing on his affidavit. The defendant and his brother, sharing the same cell, each filed an affidavit to disqualify the judge on the same day. The action followed by two days the ruling of the court in denying defendant's motion to suppress evidence. Further, the defendant, at the hearing on his affidavit, stated, "We've (defendant and his brother) discussed it all along from the start * * *." The defendant also stated, "Well, he filed one, and we discussed it, and when we got to discussing it, we found out both of us had been in front of Judge Greene and he'd made statements to both of us, and I just felt he was prejudiced against me, too."

Obviously the information giving rise to the filing of the affidavit for disqualification of the judge did not just come to the defendant four days before the trial.

Defendant was represented by counsel. His failure to consult with counsel on this point lends little credit to his affidavit. The five-day rule would be meaningless if each party were to be permitted to escape its limitations by asserting that he didn't know he could disqualify the judge and do so by not consulting with qualified counsel.

No error is found in this denial by the trial court.

The defendant's third assignment of error deals with evidence produced at his trial which defendant states was prejudicial to him.

The State called as one of its witnesses the Prosecuting Attorney of Lawrence County. The apparent purpose of using this witness was to prove motive for the crime by showing that Joan Hester testi-fied against the defendant in the preliminary hearing in Lawrence County before Magistrate Judge Max E. Hall. The evidence showed that Joan Hester was the only female witness to testify.

Defendant asserts that showing to the jury in the pending case that he was the defendant in a preliminary hearing before a magistrate wherein he was charged with aiding in the stealing of sixty-three dollars prejudiced the jury against him.

The general rule as recited in numerous decisions is:

"* * * that proof of the commission of separate and distinct crimes is not admissible, unless such proof has some legitimate tendency to directly establish defendant's guilt of the charge for which he is on trial * * *"

Continuing, the court stated,

"Exceptions to this general rule of exclusion are as well established as the rule itself. * * * 'Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; * * *"

(State v. Holbert, Mo., 416 S.W.2d 129, 132.)

■ Other exceptions are noted, but those quoted would seem to fit the case at hand. Certainly both motive and intent are necessary elements for the jury to consider, and each of these ingredients is supported by the evidence that Joan Hester testified against the defendant in another criminal proceeding.

In State v. Kilgore, Mo., 447 S.W.2d 544, 547, the Court stated:

"If evidence of other crimes reasonably tends to prove a material fact in issue, it should not be rejected because it incidentally proves defendant guilty of other crimes."

The court finds no error in the admission of this evidence concerning the defendant's victim testifying against him in a different criminal case.

◼ The defendant's next complaint of error deals with alleged prejudicial hearsay information produced by the state and permitted in the record over defendant's objections. After testifying at the preliminary hearing on August 25, 1969, Joan Hester was being returned to Greene County from Lawrence County by a deputy sheriff from Lawrence County. While en route, the deputy received a radio dispatch. It is the deputy's statement concerning this dispatch to which defendant objects. Over objection, the deputy was permitted to state:

"It was from the Sheriff of Lawrence County. He stated that he had heard the McDaris boys were going to make an attempt on Miss Hester, to be on the alert."

The jury was instructed by the trial judge that they were to receive this testimony for the limited purpose of showing that the deputy received the information, and that he acted on the information, and the testimony was not offered for the purpose of proving the truth or falsity that the defendant and his brother were making an attempt on the life of Joan Hester.

The court cannot accept defendant's contention that such testimony was singularly prejudicial to him. If this had been the only evidence in the case concerning this issue, there might conceivably be some merit to this argument. However, the witness who testified immediately before the deputy was the person who overheard the defendant made the threat concerning Joan Hester and he so testified. This witness reported that threat to the sheriff. As a result of receiving information about the threat, the sheriff caused the dispatch to be sent out to the deputies in the field. Thereafter, the defendant and his brother were observed to chase the car in which Joan Hester was riding at extremely high speeds. The entire course of events followed a pattern and was in proper sequence. The testimony given by the deputy brought no new evidence into the case, it was cumulative and the direction of the trial court kept the evidence in proper perspective.

A similar situation is noted in State v. Williams, Mo., 448 S.W.2d 865, 869.

No prejudice resulted to the defendant and no error is found in the reception of this evidence.

◼ Defendant's final point on appeal deals with the limitation imposed on his cross-examination of the State witness, Karen Bacon. Specifically, the defendant alleges he was attempting to impeach this witness by showing that she would have admitted an illegal activity had he been permitted to pursue his examination.

The quoted part of the transcript does not assist defendant in this assumption. The questions asked the witness were:

"Q. You didn't take anything over at Mount Vernon that day?

"A. I didn't say I didn't.

"Q. All right. Did you?"

An objection was sustained as to the last question.

It is not clear from the record as to what specific act of "taking" the defendant wished to prove. Apparently from the statement made to the court, defense counsel desired to try and prove that the witness was coerced into making some statement to the police by showing she may have been charged with taking the dynamite or some other offense.

The trial court, in passing on the matter, indicated that the area of inquiry could include whether the police told the witness they would charge her with theft or possession of the dynamite or other things.

Defense counsel did go into these matters without objection.

Defendant also, in order to impeach the witness, was permitted to prove that she had been convicted of a misdemeanor.

The restrictions of cross-examination were more as to technique than as to substance and were not unduly repressive.

The trial court is cloaked with much discretion in this area, as this court has frequently stated. See State v. Allen, 343 S.W.2d 63 and State v. Goacher, Mo., 376 S.W.2d 97.

When considering the record of this witness's cross-examination, the matters elicted from her and the latitude of the examination, no error is found.

Accordingly, the judgment of conviction and sentence is affirmed.

DONNELLY, P. J., and MORGAN, J., concur.

FINCH, J., concurs in result.