**Thomas Beecher CREWS, Movant-Appellant,**

v.

**STATE of Missouri, Respondent.**

No. 58128.

Supreme Court of Missouri, Division No. 2.

June 10, 1974.

Edward A. Boeschenstein, St. Louis, for appellant.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

HENRY I. EAGER, Special Commissioner.

This is an appeal from an order denying appellant's motion to vacate three concurrent life sentences imposed on pleas of guilty to first degree murder and two armed robbery charges. The pleas were entered on December 1, 1956, and this motion was filed on May 14, 1970. A full evidentiary hearing was held on December 10, 1971, with defendant and two witnesses in attendance on writs of habeas corpus ad testificandum. Defendant was and is most adequately represented by appointed counsel. The judge who imposed the sentences heard and ruled upon the motion. We accept jurisdiction under our order of April 9, 1973, since the proceeding involves life sentences and the notice of appeal was filed before that date.

We state the substance of movant's contentions raised in his briefs here, but not in the same order or wording as in the points in his brief. They are: that the interrogation at the time of his pleas did not comply with the criteria established by our Rule 25.04, V.A.M.R.; that a manifest injustice was caused since (a) defendant did not in fact plead guilty; (b) that he was misled by discussions of parole; (c) that his mental condition was unstable, and (d) he misunderstood the number of charges to which he was to plead; further, that the Court erred in believing the testimony of his former attorney, Mr. Bruntrager, and in disbelieving him and his witnesses; and, lastly, that in permitting convictions for murder and for a first degree robbery when both arose out of the same set of occurrences, he was placed twice in jeopardy. We shall designate the movant as the defendant.

Defendant was represented over a period of months and up to the time of his pleas, by Mr. Raymond Bruntrager, a lawyer highly experienced in criminal causes. There is some controversy in the record as to whether he was retained by defendant (or his family) or was appointed. Bruntrager testified that he was retained. We consider this immaterial. Bruntrager was also employed to represent one James Bradley who had been indicted for the same murder and presumably for the accompanying robbery. Bruntrager represented defendant at all times here in question. The two robbery indictments were returned in March, 1956; the murder indictment on May 1, 1956. The victim of the homicide was Thomas Mulrooney, a police officer, and the slaying occurred at the time of or immediately after one of the robberies referred to. It is substantially conceded that defendant took part in the robbery in which Mulrooney was shot, but he has steadfastly maintained that Bradley fired the fatal shot.

On December 1, 1956, defendant appeared before Judge Scott in the Circuit Court of the City of St. Louis, accompanied by Mr. Bruntrager. Judge Scott recited the charge of first degree murder and asked defendant "how do you plead to that charge?" Mr. Bruntrager answered as follows: "We withdraw former plea of not guilty and enter plea of guilty as charged, subject to the recommendation of the Circuit Attorney's office." The Assistant Circuit Attorney then stated the facts "which have been coming to the Court's attention during the past days" (Bradley's trial), including: the fact that defendant Crews was the "second man inside" at the time the officer was shot; that the evidence indicated that "some shots were fired from [sic] Mr. Crews from 32 pistol * * *" which did not take effect; that defendant was guilty of murder in the first degree, since the "act of one is the act of all," and that the State recommended life imprisonment. Bruntrager replied that defendant said that the gun he held at the time "went off" when he heard the shotgun blast, but

that it was not pointed at anyone; he asked the Court to consider defendant's age (28) and that he did not actually cause the death. The Court asked defendant if he had anything to say before sentence and the defendant, personally, said "no." On further invitation of the Court, Bruntrager further stated: that he had talked to the defendant on a "number of occasions," and discussed the plea as recently as 15 or 20 "minutes ago" and asked him if he wanted to talk to anyone to which he said "no"; that Bruntrager had been able to bring a sister to his office but defendant said he did not wish to talk to her; that he had fully advised defendant of his right to trial by jury and that he "fully understands his legal rights." Thereupon the Court sentenced the defendant to a term of life imprisonment.

Following this the first robbery charge was taken up, and the Court asked defendant if he had consulted with his lawyer; defendant answered: "Yes, sir." Bruntrager stated that he had consulted with the defendant. When asked "how do you plead to the charge?" defendant personally answered "Guilty." The Assistant Circuit Attorney identified the case as involving the robbery "which has been in evidence" and recommended a life sentence. Upon direct inquiry defendant said that he had nothing to say and that he had no one to whom he wished to speak. Sentence was imposed. Substantially the same proceedings took place on the second robbery charge, defendant stating personally that he plead "guilty."

At the evidentiary hearing the defendant testified in substance: that he was 42 years of age; that he finished the seventh grade of school, after failing some grades; that he had talked to Bruntrager at the jail about six months before the hearing on the pleas, that Bruntrager asked about a fee, and told him he had nothing to worry about. Defendant remained in jail and approximately five days before his pleas of guilty on December 1, 1956, Bradley went to trial on his murder charge. The case

was tried for four or five days, and Bradley finally interrupted the trial to enter a plea of guilty. This plea was entered on December 1, 1956, just before defendant's pleas. Bradley had been confined in reasonable proximity to defendant and they had conferred many times about their cases. During Bradley's trial he was brought back to the jail each night and he and Crews conferred nightly about the progress of the trial and the lengthy selection of the jury. Bradley and Crews were particularly upset because the Court excused those jurors on voir dire who would not "uphold" the death penalty; Bradley said that they had a "bunch of witnesses" against him and told defendant what they were saying; he said also that it looked "pretty bad," and they discussed whether Crews should plead guilty, although he admittedly knew that he had the right to a trial. Defendant had read newspapers and had listened to the radio and television reports on Bradley's trial, and he was "extremely nervous" and could not sleep.

Continuing with defendant's testimony, he stated: that Bruntrager had him brought out to the jail lobby (or interview room) on the morning of his pleas just after Bradley had plead guilty; that Bradley was there and also Mr. McSweeney, the Assistant Circuit Attorney; that Bruntrager said that he had had a hard time stopping the Bradley trial, and that defendant had better plead guilty or he would get the gas chamber; that he could get "life on a plea," that 12 years "did" a life sentence and that he would be out on parole in about nine or ten years; that Bruntrager then talked him into agreeing, and he was then taken to a cell near the courtroom, where Bruntrager came and again talked to him; that he, defendant, then said that he had changed his mind and that they went into McSweeney's office where the "gas chamber" was again discussed; that they said he would be out in 12 years and that they would help him on a parole in nine-ten years; that Bruntrager had told him that day that it was too late for a mental examination when he, Crews, sug-

gested it; that he was "all mixed up," but finally told them that he would plead guilty. The proceedings in the courtroom then followed. Defendant had been advised previously of the fact that Bradley intended to plead guilty.

Somewhat out of context we note that defendant also testified: that Bruntrager never asked him about witnesses or an alibi (but here we also note that Bruntrager heard the testimony in the trial of Bradley on the same facts); that the guards in the jail continually harassed both him and Bradley, getting them up in the night, moving their stuff, and telling them that they could "hear the pill drop" (in the gas chamber); that all this made him extremely nervous and upset. Defendant's evidence is somewhat confusing as to whether he knew of the pendency of the robbery charges, but he had been arraigned on them. He testified that he thought, when he went into the courtroom, that he was only going to plead guilty to the murder charge; however, when shown the full transcript of the pleas, he confirmed all of his answers and the other proceedings in detail, including the interrogation and his personal pleas to the robbery charges. Defendant admitted having had at least three *prior* felony convictions in each of which he had pleaded guilty, because he "was guilty."

James Z. Bradley, defendant's co-actor, testified: that he plead guilty on December 1, 1956, to the murder charge, after four or five days of trial; that he was represented by Mr. Bruntrager, who was employed by his mother; that he conferred each night at the jail with Crews concerning the developments in his trial; that he told Crews that any prospective jurors who had any scruples against the death penalty were excluded from the panel; that the guards at the jail had harassed Crews and himself as stated above; that he was then serving four life sentences, one on the present murder plea; that he recalled the conference of defendant with Bruntrager, McSweeney and himself in the jail lobby

on December 1, 1956, right after his own plea of guilty; that he (Bradley) told Crews that Bruntrager had told him if "I * * * kept my nose clean for seven years that I would be able to make parole"; that he felt things looked pretty bad for him at his trial; that defendant was opposed to pleading guilty and thought he was losing his mind; that, however, he reluctantly agreed to plead guilty.

Seibert Ray Medley testified that he was a trusty in the jail at the time of the conference just referred to; that he was cleaning the floors, etc., in the lobby at the time, and that he listened to and heard the conversation; that Crews was upset, thought he was "sick," didn't want to plead and go to the penitentiary but was told that the alternative was the death penalty and that he would be out on parole in eight or nine years; that, as related above, the guards at the jail had constantly harassed Crews and Bradley; that he had talked the pending matter over with Crews before his conviction and many times since at the penitentiary; that he had had five felony convictions.

Raymond Bruntrager testified: that he had been a lawyer since 1950, with considerable experience in criminal cases, both for the prosecution and the defense; that he was "retained" to represent the defendant and acted as his attorney for five or six months anyway, as best he could "guess"; that he also "guessed" that he talked with defendant five or six times but he was sure that it was "more than three or four"; that he did remember the case; that defendant never suggested any witnesses, never suggested an alibi, and never gave him any information which led him to believe that he had a defense; that he defended Bradley at his trial and remembered specifically his plea of guilty after the trial had lasted all week; that he did not specifically remember the conference with defendant and others on December 1, 1956, but such was possibly held as a step in preparation for trial; that he did not tell defendant that he faced "certain death"

if he did not enter a plea, and that he was not told that he would serve 12 years at most; that there was no indication of a reduction in the charge and that defendant appreciated it was a "pretty serious matter"; that if defendant had asked for a mental examination he would have filed a motion; that from the facts he knew, and which defendant told him, he did not feel there was any possibility of a verdict of acquittal and he felt that a plea of guilty was advisable; that defendant was aware of the robbery charges; that he merely explained to defendant the alternatives and told him what he "considered to be a rational and prudent decision" and left it "up to him"; if defendant had not pleaded guilty to the robbery charges he would have been tried on them; that concurrent sentences were worked out; that defendant appeared to know what he was doing and to agree that the plea was in his best interest; that this case was a "vivid" one and very dangerous for trial, and that he "lived" with it for six or eight months; that he probably discussed with defendant the possibility of parole but told him that this was "up to him"; that the earliest he ever knew of parole on a life sentence was 13 years.

The trial court made and filed findings and conclusions, in essence, as follows: that the murder arose out of one of the robberies charged; that Bradley was in court for five days on his murder trial; that Bruntrager was a most competent and respected lawyer, then specializing in criminal cases; that defendant and Bradley discussed daily the progress of his trial; that Bruntrager had a complete knowledge of the facts; that the testimony of Bradley and Medley, where opposed to that of Bruntrager, was not worthy of belief; that it was unbelievable that defendant, with his experience, would (expect to) plead to one charge of murder and leave two felony charges pending; that the concurrent sentences thus obtained were to his benefit; that there was nothing in the record to indicate that defendant's pleas were not the product of free and rational choice; that

the proceedings at the time of the plea met the requirements of the law, viewed in the background of Bradley's trial and plea, and the competent assistance of counsel; that the circumstances showed movant's complete awareness of what was transpiring and his consent thereto; that it was not established that Bruntrager made the claimed statements or promises to defendant concerning parole, and that such were beyond his authority "as Crews was undoubtedly well aware"; that it would be "incredible" to attempt to convince the Court that defendant did not know that he was pleading guilty to all three pending charges, especially in view of defendant's background; that as concerns defendant's mental state, he "knew what he was doing"; that under the Missouri Statutes the three charges against defendant constituted three separate and distinct offenses and that there was no double jeopardy; that defendant had failed to sustain his burden of proof, that his pleas were understandingly and voluntarily made, and that he was not induced to plead guilty by "coercion, misapprehension, misunderstanding or by any promises of a parole, probation or other inducements * * *." The motion was denied.

■ The Court thus directly found against all of defendant's factual allegations as well as his conclusions of law. Under this evidence the findings were not clearly erroneous, as required for reversal. Crosswhite v. State, 426 S.W.2d 67 (Mo. 1968). And we are certainly not left with a definite and firm conviction that a mistake has thus been committed, as also required for reversal. Crosswhite, supra.

Counsel argue at length, however, that the interrogation at the time of the pleas was inadequate under our Rule 25.04 and that it did not establish that the pleas were voluntary and made with full understanding of the nature of the charges. Thereon he cites: State v. Reese, 457 S.W.2d 713 (Mo. banc 1970); State v. Williams, 361 S.W.2d 772 (Mo. banc 1962); State v. Arnold, 419 S.W.2d 59 (Mo.1967); State v.

Blaylock, 394 S.W.2d 364 (Mo.1965); Williams v. State, 473 S.W.2d 97 (Mo.1971); State v. Smith, 421 S.W.2d 501 (Mo.1967). On slightly differing phases of the case he cites also: State v. Hovis, 353 Mo. 602, 183 S.W.2d 147 (Mo.1944), and State v. Rose, 440 S.W.2d 441 (Mo.1969). We have read and considered all of these cases; it will be impossible to compare them factually with the present case. The essence of the holdings in those cases is that it is the duty of the Court, in considering a plea of guilty, to proceed with caution and to satisfy itself by inquiry or discussion that the plea is made voluntarily and with a full understanding of "the nature of the charge." The latter presumably includes an understanding of the consequences of his plea. In some or all of the above cases convictions on pleas of guilty were reversed for the failure of the court to conduct an adequate inquiry.

But other cases, equally authoritative, have added to and supplemented the principles so announced. They hold: that the failure of the trial court to comply strictly with the requirements of Rule 25.04 (and the Missouri Common Law on the matter) does not necessarily require that the conviction be set aside if, in a subsequent attack upon the conviction and upon the hearing of evidence and a consideration of the circumstances, it appears that the defendant *did not* enter his plea involuntarily or *without a full understanding* of the nature of the charge, for in that event there could have been no manifest injustice under Rule 27.25; and that the issue before the trial court at the hearing on the post-conviction motion is whether or not defendant's plea of guilty was in fact made involuntarily or without an understanding of the nature of the charge, and further, that the trial court at the hearing acts as the trier of facts, and an appellate review is limited to whether or not its findings and conclusions are clearly erroneous. And, of course, the defendant has the burden of proof in a motion to set aside the plea and vacate the

conviction. State v. Mountjoy, 420 S.W.2d 316 (Mo.1967); State v. Sayre, 420 S.W. 2d 303 (Mo.1967); Patrick v. State, 460 S.W.2d 693 (Mo.1970); Mooney v. State, 433 S.W.2d 542 (Mo.1968); Flood v. State, 476 S.W.2d 529 (Mo.1972); Donaldson v. State, 477 S.W.2d 84 (Mo.1972). We conclude that under these authorities the record in this case, supported by the court's findings, affirmatively show that the pleas of defendant were *not* made involuntarily or without a full understanding of the nature of the charges and the consequences of the plea. The findings completely negative defendant's contentions.

It would be hard to find a case where a defendant had given more serious and lengthy consideration to the advisability of a plea of guilty than was done in this case; and this defendant even had a "pre-view" of the evidence and his chances from Bradley's trial, with daily discussions thereof. These pleas were entered a number of years before the death penalty was, for practical purposes, abolished. Defendant read the transcript of the proceedings made and had at the time his pleas were entered and fully confirmed all parts thereof. It is understandable that defendant was nervous and upset; he put himself in that position. The Court was fully justified in making its findings and they are certainly *not* "clearly erroneous." We also consider the delay of 13 years in filing this motion, as well as defendant's experience in connection with three prior felonies to which he pleaded guilty. The matter of credibility was for the trial court.

The remaining contention is that the convictions for murder and for one of the robberies constituted double jeopardy. Defendant cites State v. Richardson, 460 S. W.2d 537 (Mo. banc 1970). There defendant had been convicted of attempted robbery by means of a knife, he having been overcome by his intended victim and another person before actually completing the robbery. Later, when defendant filed a motion to vacate his conviction, a charge was filed against him of assault with in-

tent to maim, based on the use of the knife in the same occurrence. He was convicted on that charge and sentenced to three years. On appeal this Court held that although one may, by the same acts, commit two or more offenses, a single crime may not be split into parts, nor may one be charged as for a separate crime for an act which is a mere incident of the crime. In Richardson the defendant had held a knife against the stomach of the intended victim while attempting to rob him. That, essentially, was defendant's only act. The facts to support the contention in the present case are taken largely from the rather sketchy reviews of the situation by counsel at the time of the pleas. There is some doubt as to whether the record is sufficient to raise the point. Defendant says that, since his conviction for murder was accomplished by means of the felony murder rule, the "murder was but an incident to the robbery." That cannot be true, for a robbery cannot include a murder. From the facts as assumed it is clear that defendant was an actual participant in the robbery. Bradley supposedly shot the policeman but the defendant also fired a pistol.

In Richardson it is recognized that one may commit two or more offenses during one transaction or set of acts. We shall refer to this case again later. In State v. Whitley, 382 S.W.2d 665 (Mo.1964), at 1. c. 667, the Court said, quoting: " 'there is a distinction between an offense and the un-- lawful act out of which it arises and the rule that a person shall not be twice put in jeopardy for the same offense is directed to the identity of the offense and not to the act. Consequently, in a plea of former jeopardy * * * it is not sufficient to show that the act is the same, but it must be shown that the offense also is the same in law and fact.' "

In State v. Moore, 326 Mo. 1199, 33 S.W.2d 905 (1930), defendant had plead guilty to a charge of first degree murder which was committed during the course of a robbery; he was sentenced to life imprisonment. He was paroled after five years and a charge of robbery was then filed against him. Upon a plea of double jeopardy, after conviction, it was held that murder and robbery were not the same offense, that the offenses were not merged, and that they are "distinct and separate statutory offenses"; consequently the provision against being twice placed in jeopardy for the "same offense" could not be applicable, even though both offenses arose out of the same transaction; and it was held that Missouri does not follow the "same transaction" rule.

In State v. King, 375 S.W.2d 34 (Mo. 1964), the Court adhered to the rule stated in Moore, supra. See also King v. Swenson, Warden, 423 S.W.2d 699 (Mo. banc 1968). In Cardarella v. United States, C. A. 8, 375 F.2d 222, it was held that the test is whether proof of any additional fact,— not necessary for one charge,—is required for conviction on the other. In our case proof of a shooting and death was certainly not required on the robbery charge.

We revert again to Richardson, supra. The use of the knife was the single act of assault required to sustain the charge of attempted robbery. Evidence of that act was used again, and alone, as the basis of an independent charge of assault. No other element was necessary in the later charge. The Court merely held that the State could not pick out one element of the prior charge and make of it a separate offense. Robbery and murder are different crimes with different elements. The fact that both may be committed during one transaction does not cause them to merge. See, generally, State v. Chernick, 278 S.W.2d 741 (Mo.1955). Here, supposedly, one man was robbed and a policeman, appearing at the scene, was shot and killed. These were not only separate crimes, but crimes committed against different persons. In the present case proof of the murder required elements separate and dis-

**432**

tinct from the robbery. The contention of double jeopardy is denied.

Finding no error, the order and judgment of the trial court is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.