**STATE of Missouri, Respondent,**

v.

**Anthony Paul DAMICO, Appellant.**

No. 58153.

Supreme Court of Missouri,
Division No. 2.

July 22, 1974.

Motion for Rehearing by Supreme Court
En Banc Denied Sept. 9, 1974.

John C. Danforth, Atty. Gen., Karen Iverson, Asst. Atty. Gen., Jefferson City, for respondent.

Daniel V. O'Brien, St. Louis, for appellant.

HOUSER, Commissioner.

Anthony Paul Damico was charged in Count I with murder in the first degree and in Count II with robbery. At the

close of the evidence the court directed a judgment of acquittal as to Count II. Count I was submitted to the jury, which found Damico guilty of murder in the first degree. Sentenced to life imprisonment, he appealed. This Court has jurisdiction under its order of April 9, 1973.

█ The corpus delicti, i. e., the death of a human being by the criminal agency of someone and not by suicide, is not contested and is conclusively established.

Facts from which the jury could find beyond a reasonable doubt that the deceased Sally Lucas died by the criminal agency of appellant are established by the following circumstantial evidence: At approximately 7:30 p. m. on August 16, 1971 Lawrence Lucas, a resident of Town and Country, a municipality in St. Louis County, reported to Missouri State Highway Patrol that his wife Sally was missing. That morning Sally Lucas, accompanied by her 13-year-old daughter Susan and Susan's friend Barbara Willbrand, drove her light green 1969 Pontiac Bonneville convertible to Medsker's Stables off Wild Horse Creek Road in west St. Louis County, where Susan's horse was stabled. The girls were delivered to the stables at approximately 11 a. m. The understanding was that Sally Lucas would return for the girls at 3 or 3:30 p. m. From the stables Sally Lucas drove to the home of her friend Sharon Harding, arriving there at 11:45 a. m. Sally Lucas' hair was "frosted" and she was wearing a white culotte skirt and a light beige or light-colored print shirt or blouse and brown strap sandals. She was also wearing a diamond pendant necklace, a Christmas gift from her husband, her wedding ring and an antique ring. She departed from Mrs. Harding's home a few minutes before 1 p. m. Barbara's brother Larry was working at a filling station at Ballas and Clayton Roads that day. He knew Mrs. Lucas and was acquainted with her Pontiac automobile. Between 12:30 and 1:30 p. m. Larry saw Mrs. Lucas driving the Pontiac on Clayton Road toward the West County Shopping Center. At approximately 2:30 p. m., using a credit card, Mrs. Lucas purchased a tennis dress from saleslady Nora Slinkard at Famous-Barr store in that shopping center. The saleslady noticed that Mrs. Lucas' hair was "frosted" and she was wearing a light-colored outfit, sportswear type, with a "scooter" skirt, sandals, carrying a straw type bag. Mrs. Lucas seemed like she was in a hurry but did not act ill at ease; she was "very nice." Mrs. Annette Portnoy, called as a witness for appellant, testified that she did some shopping at the shopping center at 2:40 or 2:45 p. m.; that as she entered the parking lot, and as she left it, she saw a man, fitting the description of appellant, in front of the shopping center; that her automobile was parked two spaces away from a light green Bonneville model Pontiac; that as she started to leave and as she walked toward her car the man seemed to be following her, but after she entered her car and looked around he was nowhere in sight; that as she was backing her car out she saw a woman fitting the description of Sally Lucas coming up the same aisle beside her; that as Mrs. Portnoy was leaving the parking lot she followed the light green Pontiac, driven by the woman described. The top was down on the Pontiac. Although she saw no other person in the Pontiac she thought the man who had been following her was in the Pontiac. She saw a pair of eyes constantly watching her through the rear-vision mirror as if to say, "I'm in trouble; help me." The woman appeared to be in need of help; seemed to be asking for assistance. The Pontiac was traveling slowly, almost at a snail's pace. Finally Mrs. Portnoy passed the Pontiac, just west of the intersection of Highway 244 and Manchester Road.

Lawrence H. Lucas, husband of the victim, arrived at home at approximately 3 p. m. He did not expect to find anyone home at that time, thinking that his wife was scheduled to pick up their daughter Susan and friend Barbara at the stables on Wild

Horse Creek Road at 4:30 p. m. At 5 p. m. Mr. Lucas, concerned, called the stables, and learned that his wife had not yet appeared there. He then called several of Susan's girl friends, following which he drove out to the stables and picked up Susan and Barbara. At about 7:30 p. m. he filed Sally Lucas as a missing person with the authorities.

At 3:50 p. m. Vernon Storie, driving home from work, traveling on Wild Horse Creek Road at a point 400 feet past Long Road, came up behind a light green Pontiac, traveling slowly, about 35 or 40 m. p. h. The top was up. He followed the Pontiac for a mile and a half. As he passed it he observed that it was being driven by a woman in her late twenties or early thirties. She had frosted hair and there was a man in the car with her. All he could see of the man was his arm and from his neck down. Storie did not get a look at the man's face but he was "fairly good sized." After the highway patrol recovered the Lucas automobile Storie identified it at patrol headquarters as the same automobile he saw being driven by the woman on Wild Horse Creek Road.

Around 4:30 p. m. two sisters, Dorothy Baumgras and Dora Adams, driving on Wild Horse Creek Road in the vicinity of the Poehlman Road intersection, observed a 1969 or 1970 green Pontiac Bonneville convertible parked about 2 feet off the road. Mrs. Baumgras observed a heavy set white male standing near the partly open door of the car, with one hand on the door and the other "hooked down to the side," apparently urinating. Driving at 5 m. p. h. they passed within 2 feet of the man. He was dark-haired, stout, fat, had a dirty face and wore a dirty white T-shirt. At the trial neither of the sisters could positively identify appellant as the man they saw on the road. One of them said appellant "looks like him" but she was not sure.

Shortly after 5 p. m. a Sony portable radio was purchased at Central Hardware Store, St. Charles, Missouri, with a credit card issued to Lucas Sheet Metal Company, a concern owned by Lawrence Lucas. The signature on the charge slip was "Lawrence Lucas." Mr. Lucas testified that he did not sign the slip. A handwriting expert testified that it was not the signature of Lawrence Lucas or Sally Lucas; that it was "inconclusive" whether it was executed by appellant. Appellant, however, made a statement in which he admitted making the purchase of the radio. The address given the salesman was 10306 Lackland, which was the address of the house in which appellant was born.

At approximately 9 p. m. on August 16 appellant appeared at the Mini-Steak House on Highway 50 in California, Missouri. There he had a talk with the owner of the establishment, Art Buschmann, an old friend, and was introduced to one C. D. Pipes. At that time appellant was driving a 1969 green Pontiac Bonneville convertible. He was wearing a dark T-shirt with a slit in the sleeve; light blue trousers and a polka-dot Campbell Soup hat. He was unshaven and soiled. Pipes asked appellant if he had been in a street fight, to which he responded, "Worse than that." Appellant told Buschmann that he needed "some road money." Buschmann told appellant that he did not have much money and could not help him. Appellant took three pieces of jewelry (identified as the two rings and diamond pendant of Sally Lucas) out of a brown paper, and offered them to Buschmann, who expressed no interest in ladies' jewelry. Appellant repeated that he needed road money and said, "We done something in St. Louis this afternoon that we might have got seen at." After further conversation Buschmann said he would rake up $50 if that would help. Appellant countered with an offer of $60 for the jewelry. Buschmann took $60 out of the cash register and handed it to appellant, who took a book of matches on which the name and telephone number of the restaurant were printed, saying, "Art, I'll probably be gone for about six

months. When I cool off I'll give you a ring." Buschmann placed the jewelry in the cash register. The next day he showed it to Pipes. Buschmann later sold the jewelry to a man in Eldon, who in turn resold it. Upon payment of $2,250 the jewelry was recovered and it was identified and introduced in evidence.

On August 17, 1971 appellant checked in the Belmar Motel at Biloxi, Mississippi, where he stayed for two days, departing without paying the bill.

During the trial the following evidence was introduced on appellant's motion to suppress evidence, out of the hearing of the jury: On August 27, 1971, at approximately 4 a. m., Charles Buckley, an officer of the Panama City Beach, Florida, Police Department, on routine patrol around Wayside Park in that city, observed a 1969 green Pontiac convertible lawfully parked with several other vehicles. Buckley took down license plate numbers and dispatched them to the National Crime Information Computer. In a few minutes there was a return on the license plates belonging to the Pontiac convertible. Buckley returned to the station to decipher the N.C.I.C. message, leaving another officer to continue surveillance of the Pontiac. At the station Buckley ascertained that there was a Missing Person alert, "foul play feared," on Sally Lucas, white female, born 11–1–1934, height 5′5″, weight 105, hair brown, giving her driver's license number. The report also gave the license tag number and vehicle identification number of "69 PONT BON CV GRN." Buckley returned to the park, investigated the Pontiac, found appellant asleep on the front seat, awakened him and ordered him out of the vehicle. Asked to produce identification appellant began flipping through his billfold. He passed over his driver's license twice. The officer pointed out his driver's license in the billfold. Appellant also produced his Social Security card. He appeared extremely nervous. The officer asked him if he knew the whereabouts of Sally Lucas. He failed to respond. When asked a second time "he got extremely nervous, started jerking, his whole body started trembling and he stepped back about a foot, and he said, 'I want to talk to an attorney.'" The officer then placed appellant under arrest for suspicion of auto theft. The officer patted him down for weapons, returned to appellant the contents of his trousers except the billfold, which the officer placed in his own pocket, and applied handcuffs. Appellant was transported to the police station, booked and placed in a cell. Returning to the Pontiac, Buckley drove the vehicle to the police station. Buckley and another officer, without a warrant, searched the interior of the car, including the glove compartment, and searched the trunk. The officer removed a ladies' coin purse from the glove compartment and from the trunk removed a woman's straw purse, two pairs of ladies' shoes and a key. Other articles found in the car were examined but not removed. They included a Campbell's Soup hat, the Mini-Steak matchbook which Art Buschmann testified appellant picked up at his place on the night of August 16; a notebook in appellant's handwriting containing notes indicating that he received $60 from Art Buschmann that night, and the tennis dress purchased by Sally Lucas at Famous-Barr Co. that afternoon. After going through the items seized they were replaced in the auto where they had been found. Buckley then contacted Lawrence Lucas in St. Louis. Additional information was given to the authorities in St. Louis County. Later the Panama City Beach police chief and Buckley went through the automobile again. The initial search had commenced at about 5 a. m. At about 7:30 a. m. the Pontiac was driven to a storage lot where it was left for the FBI. On August 31, 1971 Agent Stewart of the FBI conducted a full inventory search of the Pontiac at the Troop C, Missouri Highway Patrol Headquarters in St. Louis County, to which place the Pontiac in the interim had been driven by Missouri officers. The court overruled the motion to suppress.

Officer Buckley gave the same testimony before the jury, adding that when he asked appellant if he knew the whereabouts of Sally Lucas appellant "tried to say something and just stuttered a good 35 or 45 seconds"; that when the officer repeated the question appellant "was standing there shivering and shaking and jumping around." The ladies' purse found in the glove compartment contained a driver's license, several credit cards, and a social security card in the name of Sally Dixon Lucas.

On August 28, 1971 Sgt. Kiriakos of Missouri Highway Patrol and Chief Hogan of Town and Country, Missouri, Police Department arrived in Panama City, Florida. Chief Sullivan turned over the evidence and the Pontiac to the Missouri officers, who went through the vehicle and listed the items they viewed. At about 5:30 p. m. the Missouri officers contacted appellant at the jail and read him his rights under the Miranda decision. Appellant signed a waiver of rights form. At that time appellant stated that Mrs. Lucas was alive and he could guarantee it. The Missouri officers left the jail and returned at 9:30 p. m., at which time appellant signed another waiver of rights form and proceeded to make the following statement: Appellant had lost some of his uncle's money at the horse races and decided to hitchhike to Florida. En route he was picked up by a male and a female in the green Pontiac. He identified the female as Sally Lucas. A Volkswagen bus followed the Pontiac. When they arrived at West Memphis, Arkansas the vehicles were driven beneath the Mississippi River Bridge. He described a drug and sex orgy engaged in between the female and the other two males, in which appellant did not take part. Appellant asked for the keys to the Pontiac, stating that he wanted to go into Memphis and look around. Mrs. Lucas gave him the keys, saying, "Be my guest." About 3 a. m. appellant drove into Memphis and then on to Biloxi, Mississippi. From Biloxi he drove on to Panama City, Florida.

On August 29, 1971 Sgt. Kiriakos and Chief Hogan began the trip back to Missouri in the Pontiac, transporting appellant. En route appellant signed another rights waiver form and during interrogation appellant made another and different oral statement, after Chief Hogan told appellant that he and Sgt. Kiriakos "didn't buy" the story he told the night before. Appellant's second statement was as follows: Appellant was at a restaurant on St. Charles Rock Road in St. Louis County on August 17, 1971. A Volkswagen bus pulled up and someone he knew as William J. Atler called to appellant, inviting him to accompany that party to Florida. Appellant accepted the invitation. In the back of the bus he saw a woman he identified as Mrs. Lucas, who appeared to be frightened. They started out, with a green Pontiac following them, and went to a Central Hardware store in St. Charles, where appellant was told by Atler to purchase a Sony radio with the credit card provided by Atler. Appellant purchased the radio, using the credit card. From this point the two vehicles traveled south, ending up beneath the bridge at West Memphis, Arkansas. At this location they started playing a stereotape player and taking pills. Atler told Mrs. Lucas to remove all her clothes, and he and the other male (called Tim) raped her and Atler forced her to perform an unnatural sex act. Appellant then got the keys from Atler, borrowed the Pontiac and drove off as previously stated.

At approximately 9:30 p. m. on August 30, 1971 appellant and the officers arrived at troop headquarters in St. Louis County. The officers met the first assistant prosecuting attorney, who read appellant his rights. Appellant stated that he did not want an attorney, and agreed to give and did give a videotape statement, in which he related substantially the second statement made to the officers en route to Missouri. The videotape statement was shown and played to the jury.

At one point in the examination Sgt. Kiriakos said, "Tony, once you got the car

and you had all of Mrs. Lucas' property, why didn't you get rid of it? * * * If you had got rid of it there could have been no way we could have tied you to this vehicle." Appellant answered, "Well, I don't know, maybe I just wanted to get caught."

On September 5, 1971 Alvin Steines, a farmer residing on Wild Horse Creek Road, commenced a search of his property about 5:00 p. m. after a conversation with his daughter. An odor near his property had caught his attention some ten days before. At the fork of the creek, which runs adjacent to the road, the odor was very pronounced. Steines followed the creek bed off to the right. Up on the bank in an indentation he discovered some human remains. Steines notified the highway patrol, and led the authorities to the remains. The remains were located .2 of a mile north of the intersection of Ossenfort Road and Wild Horse Creek Road, some twenty-five to thirty feet from the road, beyond the creek bed.

After examining the medical and dental proof, the defense stipulated to the identity of the remains as being those of Sally Dixon Lucas.

Dr. George Gantner, St. Louis County Medical Examiner, testified that the position of the body was such it could only have been assumed if the individual was very relaxed. No soft tissue remained on the body. It was almost completely decomposed. There was a fracture of the multiple bones of the right side of the skull. The fracture was roughly circular and appeared to have been incurred while the head was not free-swinging. Dr. Gantner testified that the heel of a shoe was a possible instrument capable of inflicting that injury. This fracture was stated to be "incompatible with life." However, it was possible that the death was produced by some other cause.

Laboratory tests on appellant's shoes revealed nothing of evidentiary value.

Margaret Louise Brett, divorced ex-wife of appellant, testified against appellant as a witness for the State that before and while she was married to appellant they would frequently go crawfishing on Wild Horse Creek, including the area where the remains were found.

■ The foregoing demonstrates a set of circumstances consistent with the guilt of appellant and inconsistent with any reasonable hypothesis of his innocence. He admitted that he was in the presence of the deceased on the day in question. Appellant's two different explanations of how he happened to encounter deceased that day were not only inconsistent and contradictory, but were fantastically unreal. A nationwide search for "William J. Atler" was fruitless, giving rise to a reasonable inference that William J. Atler was a fictitious, nonexistent person. Appellant's admitted use of Lucas' credit card so recently taken from the purse of the deceased connects appellant with her disappearance. Appellant failed to account for and in his oral statement did not deny having possession of and disposing of jewelry the deceased was wearing that morning, and having made the incriminating statements to Art Buschmann about his activities that day. He admitted having taken possession of the Pontiac automobile, although his explanation was unbelievable. His account of what happened under the Mississippi River bridge at West Memphis was false on its face. It stretches credulity to the breaking point to suggest that someone returned Mrs. Lucas to St. Louis County after the alleged trip to West Memphis and then murdered her. Although not positively identified by the witnesses, there is sufficient evidence for the jury to reasonably conclude that it was appellant whose activities the state traced from 2:45 p. m., when it may be inferred he first came in contact with Mrs. Lucas, to Wild Horse Creek Road and the site of the disposition of the body, until 9 p. m., when he disposed of her jewelry 150 miles west of St. Louis County. That evidence places him in the company of the deceased on Wild Horse Creek Road on the way to the place where

the body was found, as late as 3:50 p. m., and picks him up, alone, urinating by the side of the road near where the body was found, at 4:30 p. m. It is reasonable to conclude that the murder was committed and the body deposited in the woods between 3:50 and 4:30 p. m. His familiarity with the area where the body was deposited was made clear. The evidence of violence to the skull, with the reasonable inference that it was crushed by a heel forcibly applied while the head was immobilized, supplies the elements of premeditation, malice and deliberation. State v. Williams, 369 S.W.2d 408, 417 [2] (Mo. banc 1963). The difference between the strength of this slight and fragile woman and that of this large and powerful man accounts for his ability to subdue and kill her. That the motive for the killing was robbery, to obtain jewelry which could be converted into cash for traveling, and a vehicle for the purpose of escaping to Florida, is evident. The fact of flight is incriminating, as is the apprehension and emotional upset exhibited by appellant when the officer inquired with respect to the whereabouts of Sally Lucas. Appellant's failure to explain the notations in his notebook connecting him with obtaining $60 from Art Buschmann is illuminating. The contradiction and conflict between appellant's two oral statements and the bizarre nature of those statements destroys his credibility. Strongly implicating appellant as the murderer is the fact that he was found in possession of the victim's automobile, purse, personal effects, and the new dress she purchased August 16, together with his statement that maybe he wanted to get caught. There is sufficient circumstantial evidence to support a finding of first degree murder.

■ The court did not commit reversible error in failing to give the jury an instruction telling them that the court had directed an acquittal on the robbery charge, Count II, or in ordering defense counsel not to argue or inform the jury that the robbery charge was disposed of by the court. Appellant takes the position that upon acquittal of robbery the jury could no longer consider any evidence relating to the robbery charge; that the court was required, as a part of the law of the case, to instruct the jury to disregard any evidence applicable to Count II; that that evidence was "absorbed by the verdict of acquittal."

While it would have been proper for the court to instruct the jury "that the indictment contained charges other than those submitted but that under the evidence only those issues submitted required the jury's consideration," Mellor v. United States, 160 F.2d 757, 763 (8th Cir. 1947), such an admonition was not a part of the *law of the case* and the court's failure to so instruct did not constitute reversible error. While the case commenced as a two-count trial for (1) murder and (2) robbery and at the outset the jury was so apprised, it was perfectly evident to the jury, when the case was submitted to them on the murder count only, that the robbery charge was no longer for their consideration. It was not necessary for the court to instruct the jury on this obvious fact.

It is not true, as appellant argues, that the evidence relating to robbery was "by definition unavailable to support any other substantially identifiable offense." Some of the evidence admissible on the robbery charge (the showing that appellant was possessed of the automobile and deceased's jewelry shortly after the woman's disappearance, and evidently taken from her by force) was admissible on the murder charge because it strongly indicated motive for the killing. Without a showing of motive in a circumstantial case such as this, "no guilt can, with any sufficient legal certainty, be attributed to defendant." State v. Concelia, 250 Mo. 411, 157 S.W. 778, 781 (1913).

■ Appellant's implied argument that to admit the evidence relating to robbery might twice place him in jeopardy of his liberty is not well taken. Murder and robbery are not the same but are distinct and

separate statutory offenses, which are not merged, and the provision against double jeopardy is not applicable, even though both offenses arose out of the same transaction. State v. Moore, 326 Mo. 1199, 33 S.W.2d 905 (1930); State v. King, 375 S. W.2d 34, 37 [2] (Mo.1964); Crews v. State, 510 S.W.2d 425 (Mo.1974) (decided June 10, 1974).

■ Appellant's argument that the arrest was made without probable cause and therefore the search of the automobile and seizure of the items exhibited to the jury was a "flagrant violation of Appellant's Fourth Amendment Rights" is untenable for the reason that appellant has no standing to assert the illegality of the search and seizure. The automobile was the property of the Lucases, and appellant makes no pretense that he had any right, title or interest in the vehicle, or that at the time and place of search and seizure he was in possession and control of the vehicle with the consent and permission of the owner. Since appellant had no proprietary or possessory interest in the vehicle he cannot challenge the legality of the search, even if the arrest was unlawful (a question we do not reach). State v. Thompson, 490 S.W. 2d 50 (Mo.1973); State v. Heitman, 473 S.W.2d 722 (Mo.1971); State v. McDaris, 463 S.W.2d 813 (Mo.1971).

■ Appellant's complaint with respect to the seizure of his billfold is equally untenable. In the first place the billfold was not the fruit of a *search*. When asked for identification appellant produced the billfold and exhibited it to the officer. See State v. Sain, 412 S.W.2d 131, 135 (Mo. 1967). Nor was there an unlawful seizure. Objects falling in plain view are subject to seizure. Leffler v. United States, 409 F.2d 44 (8th Cir. 1969). The officer had a right to be in the position where he obtained a view of the billfold. Furthermore, the only items removed from the billfold and shown to the jury were appellant's driver's license and Social Security card, neither of which was incriminating or prejudicial to appellant.

■ Appellant complains of error in admitting in evidence various exhibits on the ground that they were gruesome, obscene, inflammatory, and prejudicial, appellant having offered to stipulate "to all relevant and material facts which the State hoped to prove thereby." Two photographs depicted the badly decomposed body of deceased as it appeared when discovered. Two color slides depicted the position of the remains. Three color slides showed the skull, including a cutaway view and an interior view. A videotape recorded the recovery of the remains. Appellant argues that the exhibits were not necessary to prove any vital issue. Under the rules relating to the admissibility of this sort of visual evidence, State v. Stevens, 467 S. W.2d 10 (Mo.1971), 50 A.L.R.3d 96; State v. Edwards, 435 S.W.2d 1 (Mo.1968); State v. Thresher, 350 S.W.2d 1 (Mo. 1961); State v. Moore, 303 S.W.2d 60 (Mo.1957); State v. McDaniel, 336 Mo. 656, 80 S.W.2d 185 (1935), there was no abuse of discretion in admitting these exhibits in evidence, because they shed light on material matters in issue, including the degree of the homicide; the nature of the trauma inflicted upon the victim and the instrumentality used in inflicting the blow or blows; whether the fatal blow was administered after the victim had been rendered unconscious; whether the victim's head was free-swinging at the time the coup de mort was administered; because they were corroborative of the oral testimony of the witnesses, and illustrated the conditions existing at the scene, including the fact that it was a lonely, secluded area.

In qualifying State's witness Sgt. Kiriakos of the Missouri Highway Patrol the assistant prosecuting attorney asked him whether he had any special duties, to which he answered "I am a polygraph operator." When he was asked what a polygraph operator was appellant's counsel objected that it was irrelevant and immateri-

al. The objection was overruled and the sergeant testified that he conducted polygraph examinations, "commonly known as lie detector tests." This occurred at page 1011 of the transcript. Sometime thereafter, on page 1034, the witness, relating the conversation with appellant on the return trip to Missouri, stated that as they were driving along "we" told appellant that "we didn't believe his story" (appellant's first version of what happened, given to the officers the day before). Appellant's counsel objected to the pronoun "we" and requested that the witness tell what *he* said to the witness—to be specific as to *who* made the statement. The court made an observation acquiescing in counsel's request. No other or further objection was made or relief requested. On direct examination at page 1063 the sergeant was asked whether he believed appellant's second story, to which he answered "No." After the answer was given appellant's counsel objected that it called for a pure conclusion. An inconclusive colloquy between court and counsel followed, without a definite ruling. Appellant's counsel did not move that the answer be stricken or that the jury be instructed to disregard it.

■■ The foregoing is the background for appellant's fifth point: that the court erred "in allowing Sgt. Kiriakos * * * to testify that he was a lie detector examiner of polygraphist and that he did not believe any of the appellant's statements." Appellant would connect the testimony on page 1011 with that on page 1034 so as to present the picture of a lie detector expert commenting upon the credibility of appellant. The sergeant made no such pretense. The definition of a polygraph operator, while perhaps immaterial, may not be said to have harmed appellant. In relating what he said to appellant as they were traveling back to Missouri (indicating his disbelief in his first story) the sergeant was not telling the jury that appellant's story was incredible. He was simply reciting the discussion which was the prelude to appellant's second version of what hap-

pened. It was admissible to show the inducement for appellant to talk further.

■ Appellant did not preserve anything for appellate review in connection with what happened on page 1034. Appellant got all he asked for in that exchange. With reference to the incident recorded on page 1063, the objection was made after the answer was given and therefore was untimely. In the absence of a motion to strike the answer that ruling of the trial court is not preserved for appellate review. State v. Taylor, 408 S.W.2d 8 (Mo.1966); State v. Sykes, 372 S.W.2d 24 (Mo.1963); State v. Velanti, 331 S.W.2d 542 (Mo. 1960).

Finally, appellant claims that reversible error was committed when the court allowed Margaret Brett, divorced ex-wife of appellant, to testify against appellant as to matters occurring during the marriage. Citing § 546.260, RSMo 1969, V.A.M.S.; State v. Kollenborn, 304 S.W.2d 855 (Mo. banc 1957); State v. Dunbar, 360 Mo. 788, 230 S.W.2d 845 (1950); Ex Parte Dickinson, 132 S.W.2d 243 (Mo.App.1939) and State v. Kodat, 158 Mo. 125, 59 S.W. 73, 75 (1900), appellant contends that at common law a divorced wife was incompetent to testify against her husband to the same extent as if the marriage relation had not been dissolved; that at common law a wife could not testify against a husband (except in the prosecution of one for criminal injury to the other), and that § 546.260, which was enacted to relieve against certain common-law disabilities, contains no provision eliminating the common-law disability of a wife to testify against her husband.

The ex-wife testified that before she was married to appellant, while they were going together, and afterwards during the marriage, in all on about ten different occasions, she and appellant crawfished and picnicked in the Wild Horse Creek area; that she had pointed out to a highway patrol trooper the spots where she and her ex-husband had picnicked and crawfished before she had knowledge of the particular

spot where the body of Sally Lucas was found; that she and appellant had been at that particular spot at least twice. The trooper corroborated the ex-wife's testimony concerning her trips to the area to point out places where she and appellant had crawfished and picnicked.

The specific objection made by appellant was that the ex-wife, under the constitution and statutes, "is an improper witness"; that she is not a "competent" witness. The court did not err in admitting this testimony. The objections that she was an improper or incompetent witness are not well taken. While at common law a wife was incompetent to testify against her husband that complete legal disqualification was removed by the enactment of the statute, now § 546.260, RSMo 1969, V.A.M.S., which states in plain language: "No person shall be incompetent to testify as a witness in any criminal cause or prosecution by reason of being * * * the husband or wife of the accused, * * *." As stated in State v. Kollenborn, supra, the broad statement in State v. Kodat, supra, and other cases indicating that in no event may a wife testify against her husband in a criminal case, is no longer to be followed. If we indulge in an assumption that counsel's objection was intended to block Margaret Brett's testimony on the ground of privileged communications between husband and wife, that objection would likewise have been untenable. In order to make a communication between husband and wife privileged it must be *confidential* in its nature, and where not intended to be confidential, it is not privileged. 58 Am.Jur. Witnesses, § 380, p. 222. "Where husband and wife are competent as witnesses for or against each other, either of them may testify to any fact the knowledge of which was acquired by them independently of their marriage relation, and not by reason of the confidence growing out of the marriage relation. It is immaterial that the knowledge was derived during the existence of that relation and pertains to the transactions of

the one or the other." 58 Am.Jur. Witnesses § 384, p. 225. Appellant's going picnicking and crawfishing with the witness in the area of Wild Horse Creek Road did not constitute a privileged confidential communication, made to her by reason of the confidential relationship of marriage, but was a fact ascertained by her independently of the marriage relationship. Furthermore, according to Margaret Brett, appellant's *first* trips into the area occurred *prior* to the marriage. It follows that appellant's knowledge of the area, gleaned during these premarital trips, which in and of themselves were sufficient to apprise him of its lonely and secluded character, could not possibly be counted upon as privileged confidential communications between husband and wife. The testimony with reference to subsequent trips, after marriage, was cumulative merely.

We are not deciding this point on the basis that the marital relationship had been dissolved by divorce and therefore Margaret Brett was free to testify against appellant. We are deciding it on the basis that Margaret Brett obtained knowledge of the fact that appellant was fully acquainted with this territory by general observation independently of the marriage—not by reason of any confidential communication growing out of that relation. In this connection see Anno. " 'Communications' within Testimonial Privilege of Confidential Communications between Husband and Wife as Including Knowledge Derived from Observation by One Spouse of Acts of Other Spouse," 10 A.L.R.2d 1389; and Smith v. State, 198 Ind. 156, 152 N.E. 803 (1926).

No error appearing the judgment is affirmed.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the Court.

All of the Judges concur.