STATE of Missouri, Respondent,

v.

Winford L. STOKES, Appellant.

No. 61963.

Supreme Court of Missouri,
En Banc.

Aug. 31, 1982.
Rehearing Denied Oct. 7, 1982.

Howard E. McNier, St. Louis, for appellant.

John Ashcroft, Atty. Gen., Nancy Kelley Baker, Asst. Atty. Gen., Jefferson City, for respondent.

MORGAN, Judge.

The appellant, Winford L. Stokes, was tried to a jury which found him guilty of capital murder and assessed his punishment at death. Secs. 565.001, 565.008 and 565.-012, RSMo 1978. Judgment was entered accordingly and he has appealed to this Court which has exclusive appellate jurisdiction by reason of Section 3 of Article V

of the Constitution of Missouri. Having reviewed and considered all errors enumerated by way of appeal and the sentence as mandated by § 565.014, RSMo 1978, the same is affirmed.

The record reflects that the victim, Pamela R. Benda, was thirty-three years of age, divorced and the mother of three children—then in the custody of their father; that she was employed at the Washington University Faculty Conference Center and recently had moved to an apartment at 6600 Washington in University City, Missouri; and, that during the evening of Saturday, February 18, 1978, she arrived at a lounge called "Some Place Else" on Lindbergh Boulevard in St. Louis County.

On that date, appellant was staying with a woman named Darlene at the Northwestern Hotel in the city of St. Louis. That evening she had a date with a friend named Wilbert, and appellant joined the two for dinner at the Heritage House and later arrived at the named lounge between 8:30 and 9:00 p. m. They secured a table close to the dance floor, ordered drinks and Wilbert danced with Darlene. When later orders were delayed, appellant went to find a waitress. Soon thereafter, appellant was seen dancing with the victim and she returned to the table with him and introduced herself. She joined the group which imbibed several rounds of drinks but it seems agreed that no one was intoxicated. At approximately 11:30 p. m., Darlene and Wilbert announced they were ready to leave. Appellant asked Wilbert to go to the restroom with him where he said that he "would catch a ride home" as the victim had promised to take him. She later confirmed the arrangement with Wilbert and the two were left at the lounge.

On Tuesday, February 21, 1978, the manager of the apartment building used his pass-key to allow a serviceman to enter the victim's apartment. When they entered a back bedroom, they discovered her nude body sprawled on the floor with a pillow or pillow case over her head and an apron wrapped around her neck. The police were called and her employer arrived later to identify the body. The apartment was in disarray with the bedroom ransacked, and the police remained nearly eight hours collecting evidence. Among other things, the toilet bowl contained a butcher knife and the victim's clutch purse with the contents therefrom. Several latent fingerprints were lifted from different objects in the room and four prints were determined later to be those of appellant. Although the record does not divulge how it was determined, the police later learned that the victim's pendant watch and her automobile were missing. After the discovery of this evidence, a "pickup" order was issued for appellant.

On the next day, February 22, an autopsy was performed by Dr. Eugene Tucker, a pathologist in the office of the Medical Examiner of St. Louis County. It was found that the body had passed through rigor mortis and had suffered the following wounds: a shallow incision, over the left upper chest just beneath the clavical, that was two inches in length, one and one-half inches in width and just beneath the skin; a cut on the back of the right hand; a cut on the surface of the hand; a deep cut over the back; a large cut in the posterior aspect of the lower third of the right arm which measured three inches in length, one-half inch wide and two inches deep, extending to the bone; a large area of bruising that was slightly raised and purple over the left side of the chest; a large bruise internally over the left side of the chest; numerous bruises and abrasions on both sides of the neck, some irregular, and others in a straight line running around to the posterior aspect of the neck; the right side of the lips were swollen and dark purple; dried blood was present in and outside the nose; several scrapes or abrasions were present on the face, one on the right side of the nose and another on the right temple; multiple areas of hemorrhage within the neck muscles; areas of fresh hemorrhaging in the thyroid gland and in the larnyx; one of the angles of the hyoid bone had been broken recently; a rather large abrasion over the back and sacrum; a superficial, one-fourth inch deep cut into the subcutaneous fat on the right

chest in the shape of a round puncture; and, a slight abrasion to the right knee; liver mortis was evident; examination of the vagina revealed spermatozoa and it was thought that the victim had sexual intercourse within six hours of death; that the cause of death was manual strangulation although some linear abrasions apparently had been caused by the apron; that the victim was alive at the time of injury to the chest area as reflected by the condition of the resultant bruises; and, that death had occurred more than one day prior to the autopsy.

Appellant was seen driving the victim's automobile by his estranged wife, Ramona, and her girl friend. It was seen in front of the Northwestern Hotel where appellant was staying with Darlene. Later he gave Ramona a pendant watch just prior to the two leaving in the victim's automobile for South Bend, Indiana, on March 3, 1978, where they stayed for about two weeks prior to appellant's arrest. While there, Ramona had sold the pendant watch at an antique shop.

Detectives Earl Shelton and Francis Reich, of the police department of University City, arrived in South Bend on March 25, 1978, and at 2:00 p. m. were at the police station. They were greeted by a Lt. Mahank who brought appellant to them. After being identified, they informed appellant of the investigation and gave him a *Miranda* form. Upon request, appellant read "out loud" and acknowledged each right before filling in the date and time on the form and signing his name. Having agreed to talk to the officers, he was shown two photographs of the victim and asked if he had ever seen her. He stated that he did not know the woman depicted therein and had never seen her; that he had never been to the "Some Place Else" lounge; that he did not dance with any white woman; and that he had never seen the pendant watch. When told that his wife had said he had given it to her, appellant then related how he had purchased it for $20 from a man he did not know but who had been introduced to him by one Harold King. After stating that he had never been to the victim's apartment, appellant was advised that his fingerprints had been found therein. Thereafter, he related that he had been in the apartment with his wife, the victim, two other men and two white women; and that the "group partied until about 5:00 a. m." At that time, his estranged wife had said she was a little sick and he had taken her out to the parking lot. Later the two men came out with the "keys" and he and Ramona were taken to the Northwestern Hotel. One of the two men, several days later, attempted to sell him the automobile.

When the officers told appellant they would check with Harold King, he said that would not be necessary as that was not what happened. The third version of the events of the evening of February 18, 1978, were then related to the officers. Appellant said that Darlene, her boyfriend and he went to the "Some Place Else" lounge and the victim was there; that he danced with her and decided to remain when the two companions left as she promised to take him to his home; that when they left the lounge they drove by to pick up Ramona and the three went to the victim's apartment and began drinking; that he and Ramona were getting high on "reefers" and the victim asked him to go to bed with her; that he turned her down as his wife was in another part of the apartment and the victim began striking him with her open hand. Appellant then stated that he "went off and started striking her and knocked her down." He remembered his wife standing beside him saying, "Let's go." He told the officers that he had wanted to look at the victim and then determined that she was not breathing; that he and his wife searched the apartment; that he took a man's ring, the keys to the victim's auto and the auto itself; that his wife apparently took the pendant watch as she showed it to him the next day, Sunday. When asked if he realized that he was implicating his wife in the murder, he replied, "Yes." He repeated the "factual account" when she was brought into the room, but she emphatically denied the truth thereof when she testified at the trial.

Appellant's fingerprints were taken in South Bend and they were compared with those taken at the crime scene by Officer Donald T. Brian, Supervisor of the Fingerprint Section of the St. Louis County Police Department, and he determined that: a fingerprint lift from a scotch bottle was the left index finger of appellant; the fingerprint lift from the brass bed headboard was the right ringfinger of appellant; a fingerprint lift from the same bottle was the right ringfinger of appellant; and, the fingerprint lift from the cosmetic box on top of the bedroom dresser was the right thumb of appellant.

By an indictment filed on June 12, 1978, appellant was charged with the murder of Pamela R. Benda on or about February 19, 1978. Thereafter, an information having been filed in lieu thereof was withdrawn by the state on September 20, 1979, and the record reflects reinstatement of the original accusatory document. Again, on October 22, 1979, an information in lieu of the indictment was filed which charged appellant with capital murder under §§ 565.-001 and 565.008, RSMo 1978. Therein, an allegation was added as a prior conviction that appellant had pleaded guilty to manslaughter and been sentenced to nine years confinement on August 2, 1971. The purpose thereof, as announced by the state, was to bring appellant under the Habitual Offender Act in the event a conviction for a lesser degree of homicide was returned and thereby to authorize the court to assess punishment. Appellant objected to the filing of the substitute information because it contained "endorsed" witnesses who had not been listed on the indictment. The state expressed surprise and stated that all witnesses had been endorsed. However, a review of the "file" reflected that certain names on the information were not on the withdrawn indictment. An off-the-record discussion established that "there had been a second sheet" of witnesses which was not with the indictment by reason of clerical error or otherwise; and that there was no evidence of bad faith or intent to work a disadvantage on appellant by the state. The state advised the court that "full dis-

covery" had been afforded to appellant and "every name . . . appears in the police reports." The trial court overruled the objection to the filing of the information and a later request for continuance "to more properly look at the list of witnesses and determine whether the [appellant] has been prejudiced by this endorsement." We have not found a written motion for a continuance in either the legal file or the trial transcript. Nevertheless, we look to appellant's claim that he was denied procedural due process predicated upon an analysis which seeks to balance the private interest affected, the public interest in avoiding an unreasonable burden on the state and the probable effect such safeguards will have on reducing the risk of erroneous decisions. Certainly, in this instance where the death penalty was not only sought but obtained, the "private interest" of appellant is paramount; but, beyond the listing of the broad generalizations noted, appellant advances no tangible argument reflecting any showing of prejudice. Thus, the thrust of appellant's argument seems to be an alleged lack of time to prepare for trial. In response thereto, the state relies primarily on *State v. Strawther*, 476 S.W.2d 576 (Mo.1972), which had facts somewhat similar to this case. Therein "late" endorsement of a witness was upheld over the defendant's vigorous objection due to the absence of any showing "that defendant was thereby prejudiced * * * In the exercise of the court's discretion many factors may be taken into consideration, including whether defendant waived the objection; whether the state intended surprise or acted deceptively or in bad faith, with intention to disadvantage defendant, *State v. Glon,* Mo., 253 S.W. 364; *State v. Lassieur,* Mo.Sup., 242 S.W. 900; whether in fact defendant was surprised and suffered any disadvantage, *State v. Webb,* Mo.Sup., 432 S.W.2d 218, and whether the type of testimony given might readily have been contemplated. *State v. Gooch,* Mo.Sup., 420 S.W.2d 283." *Id.* 476 S.W.2d at 579–80. The state submits that none of the factors mentioned in *Strawther* can be determined adversely against it. As to the

matter of intentional surprise or deception, none is shown as the transcript reveals that the witnesses were on a separate piece of paper with the original indictment which inadvertently was misplaced when the information in lieu thereof was filed. Finally, the state submits that the witnesses were shown in the police reports, were capable of contemplation or were obviously "innocuous." For purposes here, we assume that five *new* names had been added. The testimony of two of the late-endorsed witnesses went to the identification of the victim's automobile. Since appellant had been seen driving it, he could assume evidence of ownership would be offered—particularly since he claimed no interest therein. The testimony of Ramona, the ex-wife of appellant, identified her as having been married to but separated from appellant during the month of February 1978 (when the crime occurred) and finally divorced from him on January 22, 1979; and, that she had not been a participant in the homicide nor present thereat as she had never been to 6600 Washington and further that, "I don't even know where it is." That she denied any immediate involvement in the crime, after having been implicated for some reason known only to appellant, would not come as any surprise. Further, for some continuity of thought, we note that her testimony was admissible by the holdings in *State v. Damico,* 513 S.W.2d 351 (Mo.1974) and that more recently in *State v. Euell,* 583 S.W.2d 173 (Mo. banc 1979). Wilbert's testimony only confirmed appellant's story of their being together part of the evening at the lounge and was as innocuous as that of Myrna Savoldi, a friend of the deceased, who only said that the knife shown to her looked like one she had seen a few weeks earlier in the victim's apartment.

Combined with appellant's challenge to the late endorsement of the witnesses as just noted was a further complaint that the notice of the "statutory aggravating circumstances" taken from § 565.012[1] was filed immediately prior to trial. Again, no allegation was asserted nor effort made to show any specific prejudice created thereby; and, although we do not commend the state for being so untimely, we cannot find how appellant's cause was prejudiced in any manner. In fact, the record reflects that neither appellant nor his counsel could articulate a different conclusion. As the record shows, appellant's counsel admitted that on September 20, 1979—a full month before the trial—that the state through its prosecutor had declared an intent to seek the death penalty. The record further accounts for some of the delay being caused by appellant, during most of the time period of interest here, having another capital murder charge pending in the City of St. Louis. It seems agreed that the officials had planned for the City to proceed first so that appellant would not have to be shuffled "back and forth" between the City and County. Later, with the charge in the City "dragging out" it was decided to proceed with the instant case. Furthermore, a brief review of appellant's criminal record is of great significance reference the issue: On August 4, 1971, there were convictions for Manslaughter, Robbery First Degree, Robbery First Degree and Escaping Custody; and thereafter, on September 10, 1979, appellant pleaded guilty to Murder Second Degree, Robbery First Degree and Armed Criminal Action, Escaping Custody and Stealing a motor vehicle and Escaping Custody before conviction. Certainly, the aggravating circumstances as filed could not have come as a surprise to appellant much less his counsel. Under the facts as

---

1. § 565.012.2(1) Whether the defendant has a substantial history of serious assaultive convictions.

(2) § 565.012.2(4) Whether the defendant murdered Pamela R. Benda for the purpose of receiving money or any other thing of monetary value.

(3) § 565.012.2(7) Whether the murder of Pamela R. Benda involved torture or depravity

of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman.

(4) § 565.012.2(9) Whether at the time of the murder of Pamela R. Benda the defendant had escaped from the lawful custody of a place of confinement.

presented, we find the point without merit as there was no denial of due process of constitutional significance.

▇ Appellant contends that the trial court erred in allowing the state to seek the death penalty as it penalized him for exercising his right to a trial by jury. The argument stems from the record showing that during the summer of 1979 the appellant and state had engaged in "plea bargain" negotiations resulting in a plan for appellant to plead guilty to second degree murder on September 20, 1979. However, he changed his mind and decided to plead not guilty. The prosecutor then formally announced his intention to seek the death penalty, which, as heretofore noted was over a month before trial. There is no indication whatever of vindictiveness on the part of the state, and nothing could be gained by extended consideration of cases thought relevant and cited by the parties. Sufficient guidance may be found in *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), wherein it was said:

> The question in this case is whether the Due Process Clause of the Fourteenth Amendment is violated when a state prosecutor carries out a threat made during plea negotiations to reindict the accused on more serious charges if he does not plead guilty to the offense with which he was originally charged. *Id.* at 358, 98 S.Ct. at 665.

> \*     \*     \*     \*     \*     \*

> ... in the "give-and-take" of plea bargaining, there is no element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer.

> While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'—and permissible—'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.' *Chaffin v. Stynchcombe,* [412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714]. *Id.* [434 U.S. at] at 363 [98 S.Ct. at 668].

Appellant, relying on *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1967), alleges that the trial court erroneously sustained the state's challenges for cause of two veniremen (Nos. 21–36). Although not preserved for appellate review, we consider the argument as made on the basis of "plain error" and find it without merit. The question is not novel and has been considered many times by this Court. Mo. Dig., Jury, Key No. 108. Recent considerations thereof may be found in *State v. Newlon,* 627 S.W.2d 606, 615 (Mo. banc 1982) and *State v. Mitchell,* 611 S.W.2d 223, 228 (Mo. banc 1981). Relative to the problem, generally, is this Court's holding in *State v. Treadway,* 558 S.W.2d 646, 649 (Mo. banc 1977), *cert. denied,* 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 124 (1977), that:

> In determining the qualifications of a prospective juror, the trial court has very wide discretion, and the court's ruling will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion. (citations omitted) All doubt should be resolved in favor of the finding of the trial court because he is in a far better position to determine a challenge for cause than an appellate court. (citations omitted)

The examination produced the following exchanges:

> MR. WALSH: (the prosecutor) ... I want to ask you if there are any of you on this jury panel that have any religious feelings or other feelings or conscience or scruples that would prevent them from even considering the death penalty no matter what the evidence was that you eventually heard?

> In other words, that no matter what the situation was, you would never give the death penalty. You just simply do not believe in it....

> My point is, though, in this case, upon hearing the evidence and the law, you— the jury function is going to decide; and maybe the decision, based upon the evidence as they hear it and the law that the

Court instructs them, and if it got to the point where the law said one of the possibilities for you to consider is the death penalty, could you put aside your own personal feelings in order to consider the death penalty? As a possibility? Or would you automatically rule it out no matter what the evidence was?

JUROR NO. 16: I'm sorry. I really would have to think about it. I have always felt the death penalty, you know, should be eliminated.

.     .     .     .     .

JUROR NO. 21: I feel the same way.

MR. WALSH: My question then is, after you hear the evidence and the instructions of the law, could you set aside your personal feelings and consider it as a possible punishment in this case?

JUROR NO. 21: Like I said, I just don't believe in the death penalty.

MR. WALSH: Does that mean no matter what the circumstances were, you would not vote to impose the death penalty?

JUROR NO. 21: Unless someone changed my mind. At the moment, no, I don't believe in it.

.     .     .     .     .

JUROR NO. 36: I also have the feeling I don't believe in the death penalty. I don't believe I could give a sentence like that.

MR. WALSH: You don't believe you could?

JUROR NO. 36: No.

MR. WALSH: You don't believe in any circumstances?

JUROR NO. 36: No.

MR. WALSH: You wouldn't even be able to consider if the Court instructed you on it?

JUROR NO. 36: Well, as far as now. I would say no.

■ Even a reading of the cold record conveys a belief of the two that they could not impose the death penalty in any case; and, we cannot say that the trial court erred by finding an unequivocal or unambiguous opposition thereto and thereafter sustaining challenges to their participation.

■ Appellant asserts that a "Witherspoon" death-qualified jury does not represent a fair cross-section of the community and he thus was denied his sixth amendment right to a fair trial. The argument was rejected conclusively in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, on the premise that an accused does not have a right to be tried by jurors who have indicated explicitly an inability to follow the law and instructions of the court. Further, as said by this Court in *State v. Strickland,* 609 S.W.2d 392, 397 (Mo. banc 1980):

> The argument that the exclusion of jurors opposed to capital punishment substantially increases the risk of conviction has been continually rejected because the evidence offered in support was considered too tentative and fragmentary. (citations omitted)

■ Complaint is made that his jury was not fair and impartial because he was allowed only nine peremptory "strikes" while prior to October 1, 1979, he would have had twelve. Initially, we note that the complaint centers around the trial court's act of following the applicable statute. Prior to October 1, 1979, § 546.180, RSMo 1969, gave the defense twelve peremptory strikes and the state six. New § 546.180, RSMo 1979, gives each "side" nine peremptory strikes. As shown by the record, the homicide for which appellant was charged was prior to the change and the trial was after the effective date thereof. He cites no authority for his position but claims the new statute constitutes an *ex post facto* law. The defendant in *State v. Eaton,* 316 Mo. 995, 292 S.W. 70, 74 (1927), presented the same argument which was rejected. Therein, it was said that: "The number of challenges to which the defendant on trial is entitled is purely a procedural matter, and does not constitute a substantial right. In 12 Corpus Juris, 1103, it is said: 'Where a law relates to matters of procedure merely, and does not deprive the accused of any substantial protection, it is not ex post facto. Thus a law changing qualifications,

method of selection, and method of impaneling jurors, challenges allowed the accused or the prosecution, * * * is not ex post facto as to offenses committed before its passage.' "

■ It is contended that the trial court improperly admitted into evidence certain photographs of the victim's body as they were not probative of any material fact. Exhibits # 36 and # 44 were admitted over appellant's objection and we, again, look to the challenges thereto under the rules pertaining to plain error. In any event, we find both relevant and not "legally" inflammatory. Exhibit # 36 is a photo depicting the right-rear plain of the victim's neck and exhibits lateral and parallel bruises consistent with the medical examiner's testimony regarding the cause of death, i.e., manual strangulation. He also testified that the body exhibited "liver mortis," a discoloration caused by blood settling into the lowest tissues thereof once circulation has ceased, and Exhibit # 44 confirmed its presence which tended to confirm the testimony that the victim had died several days before discovery. Nothing has been presented suggesting the trial court ruled erroneously in admitting the photos mentioned.

■ It is alleged that the trial court erred in sustaining the state's objection to appellant's request that he be allowed to introduce evidence from which the jury might infer that another person *may have committed* the murder. The evidence tendered presumably would have established that a former boyfriend of the victim, one Leroy McPherson, had an opportunity to commit the crime; that his fingerprints were found in the apartment; that approximately two weeks prior to her death the victim had reported his assault upon her to the police; and, that the police, after the instant crime, had first arrested and later released McPherson. After a hearing thereon, the court ruled the evidence to be too remote in time and irrelevant. In challenging the ruling made, appellant asserts that the evidence against him was all circumstantial and that tendered could have been persuasive. In response, the state submits that there was direct evidence of appellant's guilt, particularly the confession he gave police officers. As said in *State v. Ayers,* 470 S.W.2d 534, 536 (Mo. banc 1971): "In arguing that the State's case was wholly circumstantial, appellant overlooks the direct evidence provided by appellant's voluntary statements. Appellant's admission that he shot a man . . . was direct evidence of his guilt." See also: *State v. Spry,* 592 S.W.2d 313, 315 (Mo.App.1979). Under the facts presented, the trial court cannot be charged with error; and, this Court's holding in *State v. Umfrees,* 433 S.W.2d 284, 287–88 (Mo. banc 1968), appears dispositive of the point:

> Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime. (citations omitted) The test generally for the admission of such evidence is stated in 22A C.J.S. Criminal Law § 662 b, at page 451, as follows: 'The evidence, to be admissible, must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides accused as the guilty person. Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.

■ Argument for discharge of appellant is made, predicated upon allegations that the earlier indictment was defective in failing to accurately specify the statute under which appellant was charged. Such errors, if any, would not dictate the relief requested as the information upon which the trial was had admittedly complied with the law; and even appellant fails to suggest in what respect he could have been prejudiced.

■ Appellant alleges that § 565.006.2 unconstitutionally limited evidence that he otherwise might have presented by providing that: "In such hearing, subject to the laws of evidence, the jury or judge shall hear additional evidence in extenuation, mitigation, and aggravation of punishment . . . ." The allegation is directed toward the requirement that evidence offered be in compliance with the "laws of evidence." Since appellant offered nothing by way of evidence in "mitigation" the argument is truly academic and is rejected.

■ Other alleged points of error attack the existing statutory scheme for consideration of and assessment of the death penalty in Missouri with arguments recently entertained and fully developed in *State v. Mercer,* 618 S.W.2d 1 (Mo. banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981); *State v. Shaw,* 636 S.W.2d 667 (Mo. banc 1982); and, *State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982). For the reasons apparent therein, the same lack merit.

■ Lastly, having considered those errors enumerated by way of appeal, we consider the punishment assessed as mandated in § 565.014.3(1), (2) and (3).

First, there is nothing in the record suggesting that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Second, the evidence supports the jury's finding of the specified aggravating circumstances as shown by the admitted prior convictions and "pleas" of appellant. (1) Certainly the state proved that appellant "has a substantial history of serious assaultive convictions" by reason of his present conviction being the *third* for the commission of a homicide plus two others on first degree robbery charges and armed criminal action. (2) "Things of monetary value," *i.e.,* the automobile, man's watch and the pendant watch were taken from the victim. Prior to considering number (3), we note that appellant on the dates in question was an "escapee" from "the lawful custody of a place of confinement" as submitted in (4). We return to number (3) of the aggravating circumstances because it provides the greatest guidance in our effort to comply with the dictates of § 565.014.3(3) in resolving "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." The jury by returning an affirmative finding to aggravating circumstance number (3) thereby resolved that the murder of Pamela R. Benda involved "torture or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman." Without being too redundant, the evidence can be divided into four types of acts. The medical examiner testified that the victim had been severely beaten, as revealed by large and deep bruises about her head and upper chest. She had sustained at least five wounds caused by a sharp instrument. When found, an apron was wrapped around her neck which bore minor linear lacerations, indicating that the murderer attempted to strangle the victim by tightening the apron in a garrate-like fashion. The evidence would show these acts and resulting injuries to have been sustained while the victim was alive. Finally, the medical examiner testified that the murderer manually strangled the victim as shown by the violent internal damage to the neck, and thus exaggerating the serious physical abuse of the victim prior to her *actual death.*

Having found the "threshold requirement," *i.e.,* the presence of the statutory aggravating circumstances, the jury considered all the evidence and recommended that the death sentence be imposed on appellant.

After taking into account both the crime and the defendant, we have concluded that the penalty assessed is not excessive or disproportionate to the penalties imposed in similar cases. We have surveyed, again, those cases specifically identified in *State v. Shaw,* 636 S.W.2d 667 (Mo. banc 1982) and the more recent case of *State v. Robert Baker,* 636 S.W.2d 902 (Mo. banc 1982).

Finding no reversible error, the judgment should be and is hereby affirmed.

DONNELLY, C. J., and RENDLEN and WELLIVER, JJ., concur.

HIGGINS, J., concurs in separate concurring opinion filed. SEILER, J., dissents in separate dissenting opinion filed. BARDGETT, J., dissents and concurs in separate dissenting opinion of SEILER, J.

Execution date re-set for October 28, 1982.

HIGGINS, Judge, concurring.

I concur fully in the opinion of Morgan, J., which affirms the judgment of conviction of capital murder and sentence to death.

I file this separate opinion to speak to the reservation of Seiler, J., in dissent, concerning whether "a substantial history of serious assaultive criminal convictions," § 565.012.2(1), RSMo, as an aggravating circumstance, is "unconstitutionally vague."

The dissenting opinion cites *Arnold v. State*, 236 Ga. 534, 224 S.E.2d 386 (1976), in which the Supreme Court of Georgia held that the aggravating circumstance " 'The offense of murder . . . was committed by a person . . . who has a substantial history of serious assaultive criminal convictions,' " was "too vague and nonspecific to be applied evenhandedly by a jury." *Id.* at 391–2. The defendant specifically challenged the phrases "substantial history" and "serious assaultive criminal convictions"; however, the court examined only the substantial history standard. It found that substantiality is a "highly subjective" criterion. Implicit in its cursory discussion seems to be a concern that one jury might find two convictions of Crime A to be substantial while another might find four similar convictions insubstantial.

The court's reasoning is not persuasive because subjective analyses are inherent in every jury deliberation. It is difficult to perceive how the substantiality of a defendant's history is any more subjective than a jury's collective understanding of the reasonableness of doubt. In both cases, individual jurors will likely have their own personal qualitative and quantitative yardsticks against which these standards are measured. In both cases, the jury is compelled to arrive at a group decision on whether the evidence presented exceeds all the individual standards. The court's reservation about this standard is rendered even less persuasive when one considers that it had no difficulty in defining, limiting and upholding other standards such as "outrageously or wantonly vile," "horrible" and "inhuman," particularly when these terms are at least as subjective and emotionally provocative.

Reading the entire discussion on this aggravating circumstance leaves one with the firm impression that the Georgia Court was not convinced that this defendant's particular history was substantial, and therefore, this defendant should not be put to death. The court could have reached the same result by exercising its statutory duty in review of the sentence. While the phrase "substantial history" is not measurable with mathematical precision, there does not appear to be much within the realm of jury perceptions that can be so measured. This inability alone would not provide a sound reason for finding this statutory aggravating circumstance unconstitutionally vague, the Georgia Court's reasoning notwithstanding.

SEILER, Judge, dissenting.

I respectfully dissent and make the following observations: I reserve judgment on the issue whether the statutory aggravating circumstance taken from § 565.012.2(1), "whether the defendant has a substantial history of serious assaultive convictions", is unconstitutionally vague. Appellant raised and argued the point in his brief, but the principal opinion does not discuss the issue, and the facts here do warrant an application of pertinent constitutional tests. However, it should be pointed out that the Georgia Supreme Court, whose lead this court repeatedly follows in death penalty cases, held the "serious assaultive convictions" aggravating circumstance unconstitutionally vague in *Arnold v. State*, 236 Ga. 534, 224 S.E.2d 386 (1976).

I am unable to agree with permitting the prosecution to get by with not serving defense counsel until the morning of the trial with notice of aggravating circumstances. For the state to seek to take a man's life is a serious matter and we should insist that the state proceed in a fair and orderly fashion. The state knows that it must make known in advance of trial the evidence in aggravation proposed to be introduced. This necessarily means timely notice, and notice on the morning of trial is not timely. The matter of aggravating circumstances is no trifling matter. Without aggravating circumstances, no death penalty is possible. The defendant is entitled to know what is claimed in this regard. Defense counsel needs time to appraise the state's claim and to prepare to meet it. This cannot be done when notice is not given until the morning of the trial. A remark by the prosecutor a month earlier that he intends to seek the death penalty is no substitute. The prosecutor has to do more than that. He is not bound by such a remark, and he knows that such a remark alone is not sufficient. The defense should not have to speculate on whether or not the prosecutor actually intends to seek the death penalty or whether he is merely using this threat as a negotiating chip for plea bargaining. In this case, for example, just a month before trial the prosecution was ready to accept a guilty plea to a second degree murder charge. Then for some reason the defendant refused to go through with the deal. For all the defense knew, the prosecutor's remark was no more than a threat.

I would make it plain that we will not permit this sort of handling of a death penalty case. It is not imposing any undue burden on the state to require the prosecutor to give a timely notice with respect to aggravating circumstances in cases where the death penalty is sought. Prosecutors can easily comply with this requirement, and I think we should insist on it. We are setting a bad precedent when we give our tacit approval to what occurred here. The principal opinion says that, after all, defendant himself knew about his prior convictions, so that could not have come as any surprise, but in my opinion that will not do as a method of handling the giving of notice of aggravating circumstances. There are fifteen statutory aggravating circumstances and we should not have to decide the matter of notice on the basis of whether the defendant ought to have been aware of what the prosecutor was going to do about specific aggravating circumstances. That leads only to unnecessary factual disputes. All this would be eliminated if the state were required to act reasonably and give timely notice of what it proposed to do. We should not accept any less where the outcome is to take the defendant's life.